BRENNAN (CARRAHER v.). See Case No. 2,441.

BRENNAN (PRENTISS v.). See Case No. 11,385.

---

## Case No. 1,831.
### BRENNAN v. The VIRGO.[1]

Circuit Court, E. D. New York. August 16, 1876.[2]

COLLISION—BETWEEN STEAM AND SAIL—LIGHTS—SPEED.

[1. A steamer off the New Jersey coast at night on a southwesterly course, in fair weather, with plenty of sea room, met a schooner bearing northeasterly, so that, except for a change of course, a collision was probable. The steamer ported her helm twice so as to allow the schooner to keep her course, but a collision occurred, the port bow of the schooner striking the steamer on the starboard side. Held, it being apparent that the collision would not have occurred had the schooner held her course according to the rules of navigation, and that the steamer was properly handled under the circumstances, that the latter was not liable.]

[2. When the red light of the schooner was first seen from the steamer, the helm of the latter was ported, and shortly thereafter, both lights of the schooner becoming visible, the

---

[1] [Not previously reported.]
[2] [Affirming The Virgo, Case No. 16,975.]

steamer's helm was again ported. *Held* that, if the latter action was erroneous, it was at most an error of judgment forced upon the steamer in an emergency because of the schooner's misconduct.]

[3. The speed of the steamer being the usual rate, it was not an element in the collision, she having stopped so soon as the necessity was apparent.]

[Appeal from the district court of the United States for the eastern district of New York.

[In admiralty. Libel by Brennan and others, owners of the schooner Speculator, against the steamship Virgo, to recover for injuries sustained by collision. The district court dismissed the libel (Case No. 16,975), and libelant appeals. Affirmed.

[For a decision granting libelant's motion to file new security for value pending this appeal, see Case No. 16,976.]

HUNT, Circuit Justice. About two o'clock of the morning of September 2, 1872, a collision occurred between the steamship Virgo and the schooner Speculator, off the Jersey coast, between Cape May and Absecom.

The libel, on behalf of owner of the schooner, alleges, that the green light of the steamship was first seen on the port bow of the schooner, and then the three lights were seen, the steamer coming directly for the schooner; the schooner being close hauled on a starboard tack, the wind being easterly. The steamer was going south, and the schooner was going north. To bring the green light of the steamer first in view of the schooner, one of the two facts must exist,— the steamer must have been on a course easterly as well as southerly or the schooner must have been considerably to the west of the steamer.

The answer avers that the course of the steamer was south by west-half-west; that the red light of the schooner was first seen on the steamer's starboard bow, but nearly ahead.

The evidence that the steamer was on a southwesterly course is abundant, and is uncontradicted. We may take it as proved that the steamer was on that course, and that the schooner was considerably to the west of her, on a course generally north-east. The mate of the steamer testifies, that he first saw the white light of the steamer, and she was then on the schooner's port bow about three points. He then saw her green light, and in about three minutes the vessels came together. The red light, he says, he had not seen, as it was on the other side. The statements of the libel and of the answer, and the evidence of the mate of the steamer and the mate of the schooner, substantially concur as to the position of the two vessels when they were respectively discovered. The steamer was going in a southerly direction; the schooner in a north-easterly direction; the latter to the west of the latter and head on, or nearly so, the schooner bear-

ing rather more south than the steamer to the north. As the vessels thus ran, a collision was probable. There was plenty of sea room, perfect equipment on both vessels, and nothing to prevent the application of the general rule that the schooner should hold her course, and that the steamer was bound to avoid the collision. The mate of the schooner testifies that the schooner was kept on her course, and that there was no variation. The man at the wheel, or the other man on deck, is not produced to sustain him. No one else speaks to the point. The mate and the lookouts of the steamer give a different account. They all testify on this point, the mate with the greater intelligence.

The mate states that he first saw a faint red light a point and a half off the starboard bow of the steamer; that the steamer's helm was then put hard aport, the vessel hove around, and she was steadied on that course. The effect of this movement was to increase the westing of the steamer, and to carry her astern of the schooner. Presently he saw both lights of the schooner, and again ordered the steamer's helm to be ported, and then he saw her green light only. This account can only be true on the theory that the schooner not only failed to hold her first course of the general direction of northeast, but that she swung to the west so far as first to show both her lights squarely to the steamer, and then again so far as to present her green or starboard light only to the steamer. What might otherwise be an embarrassing question of fact upon the statement of witnesses is rendered less difficult of solution by a reference to the manner in which the vessels came together, in respect to which the evidence does not seriously differ. The vessels going severally north-east and south-west, the collision must occur by the striking of the port side of the schooner, upon the port of the steamer or starboard to starboard, as the schooner should be to the south or to the north of the steamer. That two vessels going respectively north-east and southwest should collide by striking the port side of the one upon the starboard side of the other, or the bow of one at right angles to the port side of the other, is as impossible as that vessels going north and south, with sterns towards each other, should collide before they had sailed around the world. The mate of the schooner testifies that when the collision occurred "the steamer was laying across our bows; we were struck on our starboard bow and about the jibboom, by the bow of the steamer." The captain of the schooner says, that when he came on deck "there was a vessel, say about thirty yards from us, running directly for our starboard bow. They put her helm to port, and she slewed sufficient to strike our bow sprit with her port bow;" and again: "She struck us on our starboard side with her port bow and broke off our jib-boom."

The mate of the steamer says: "At the mo-

ment of the collision, our vessel was about west south-west. I looked at the compass. When we came together, the schooner came stern on and struck us a full blow at right angles. When the schooner struck us she slewed around broad side to us, so that her starboard side came along our port side."

I cannot reach any other conclusion upon this testimony than that the schooner made a great change in her course after she was sighted by the steamer,—she swung around so far that what was a northeasterly course when first seen became nearly a north west course when the accident occurred. Taking the schooner's evidence only, there can be no avoiding the conclusion that she filled away running across the course of the steamer. The steamer's evidence is to the same effect. I cannot say that there was error in the action of the steamer in porting the second time. And in any event an error of judgment in an emergency forced upon her by the misconduct of the schooner will not change the rights of the parties. Nor do I see any difficulty to arise from the speed of the steamer. It was the usual speed not excessive, and was not an element in the collision; she stopped as soon as the necessity appeared. Upon the whole case I am of the opinion that the judgment below dismissing the libel was right, and should be affirmed.